UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

TRACY WARCHOLAK,

Plaintiff,

v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

Defendant.

---

**REPORT AND RECOMMENDATION**

06-CV-0023-RJA-JJM

This case was referred to me by Hon. Richard J. Arcara to hear and report in accordance with 28 U.S.C. §636(b)(1) (Dkt. #13). Before me are the parties' cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) (Dkt. ##6, 8). Oral argument was conducted before Hon. Kenneth Schroeder, Jr., on September 29, 2006 (Dkt. #12). For the following reasons, I recommend that defendant's motion be denied, and that plaintiff's cross-motion be granted in part.

## PROCEDURAL BACKGROUND

Pursuant to 42 U.S.C. §405(g), plaintiff seeks review of the final decision of the Commissioner of Social Security denying her application for social security disability insurance ("SSDI") benefits (Dkt. #1). Plaintiff filed an application for SSDI benefits on October 22, 2002 alleging a disability onset date of December 1, 1999 (T53-55).[1] Her application was denied

---

[1] References to "T" are to the certified transcript of the administrative record filed by the defendant in this action.

on December 19, 2002 (T38-40).[2] A hearing was conducted before Administrative Law Judge Theodore Burock on September 21, 2004 (T27, 277-302). Plaintiff was represented at the hearing by Kenneth R. Hiller, Esq. (T27). On July 8, 2005, ALJ Burock issued a decision denying plaintiff's claim on the ground that there were a significant numbers of jobs in the national economy that plaintiff could have performed (T27-35). ALJ Burock's determination became the final decision of the Commissioner on December 9, 2005, when the Appeals Council denied plaintiff's request for review (T5-7).

## FACTUAL BACKGROUND

### Medical Records

#### 1. Evidence Prior to the Relevant Period (Prior to December 1, 1999, Plaintiff's Alleged Onset Date)

Plaintiff first received treatment for hearing problems from Alexander K. Mandych, M.D. in March 1996 (T147). At that time, plaintiff reported diminished hearing and tinnitus[3] in her left ear (Id.), but an audiogram was normal (T191-92). Plaintiff continued to complain of tinnitus (T141-146) causing Dr. Mandych to refer plaintiff to Daniel Schneider, M.A., F.A.A.A., an audiologist (T134, 141), who performed an audiometric evaluation on March 2, 1998 (T179-88). He reported that plaintiff had two types of tinnitus: crackling and popping when swallowing, and high pitched tinnitus in her left ear (T179). Multi-frequency studies confirmed that there was a fairly high frequency characteristic resonance in the left ear

---

[2] Plaintiff also filed an application for supplemental security income, but this was denied and no hearing was requested by plaintiff (T27).

[3] Tinnitus is "[a] subjective ringing or tinkling sound in the ear. . . . It may be caused by impacted cerumen, myringitis, otitis media labyrinthitis, Meniere's symptom complex, otosclerosis, or hysteria." Taber's Cyclopedic Medical Dictionary (18th ed. 1997).

(Id.). The test profile was consistent with a very mild conductive hearing loss and ossicular stiffening process (T180).

Plaintiff returned to Dr. Mandych on March 11, 1998 (T140) and he reported that the "ossicular stiffening process" of her ear was related to her conductive hearing loss and probably tinnitus (T140). In April and May 1998, plaintiff reported continued irritation in her left ear, including almost constant high pitched ringing, as well as intermittent episodes of dizziness (T138, 139).

Plaintiff underwent a tinnitus evaluation and electronystagmography on June 2, 1998 (T156-160). Based on these tests, Mr. Schneider concluded that plaintiff had "mild, uncompensated vestibulopathy" (T159).

On November 19, 1998, plaintiff was seen by her treating physician, Bohdan Kawinski, M.D., with continuing complaints of tinnitus (T209). She also reported being depressed about the tinnitus, having insomnia and being fatigued (Id.). Dr. Kawinski diagnosed chronic tinnitus, left shoulder arthralgia, mild vestibulopathy, and high blood pressure (Id.). On December 17, 1998, Dr. Kawinski diagnosed plaintiff with "persistent vertigo/tinnitus" (T208). A CT scan of plaintiff's head and posterior fossa was negative (T212).

On December 29, 1998, plaintiff was seen by Edward Kowalski, M.D., an otolaryngologist, who opined that plaintiff had all the symptoms of Meniere's Disease[4] with the exception of fluctuating hearing loss (T126). A January 21, 1999, microscopic ear examination conducted by Dr. Kowalski was normal (T125). However, he reported that plaintiff had early

---

[4] Meniere's disease is "[a] recurrent and usually progressive group of symptoms including progressive deafness, ringing in the ears, dizziness, and a sensation of fullness or pressure in the ears." Taber's Cyclopedic Medical Dictionary (18th ed. 1997).

Meniere's Disease, and prescribed Valium (Id.). Dr. Kowalski also ordered a magnetic resonance imaging ("MRI"), which was normal, (T127-28).

When plaintiff returned to Dr. Kawinski on January 25, 1999, she reported that she still had tinnitus and had mild vertigo in the mornings, which "resolves gradually" (T207). Dr. Kawinski diagnosed possible Meniere's Disease and recurrent, chronic vertigo and tinnitus (Id.) On August 29, 1999, plaintiff was seen by Dr. Kawinski, who stated that plaintiff's labyrinthisis[5] had resolved (T206).

On Dr. Kowalski's referral, plaintiff was evaluated by Ernesto Diaz Ordaz, M.D., on July 1, 1999 (T131). He diagnosed plaintiff with "[t]innitus of central origin", "[e]ar crackling of undetermined cause, most likely of central origin", and "[e]nvironmental allergies" (Id.).

**2. Evidence During the Relevant Period (From 12/1/99 to 6/30/00, the Date Plaintiff's Insured Status Expired)**

On February 7, 2000, plaintiff was evaluated by Stephen R. Sobie, M.D. (T150-51). He found plaintiff's audiometric data to be within normal limits (Id.). He concluded that plaintiff likely had benign tinnitus, without any real underlying pathology (Id.), early Meniere's syndrome (T150), or mild eustachian tube dysfunction, which Dr. Sobie did not believe required treatment (Id.). Dr. Sobie prescribed Valium (T150-51).

On February 24, 2000, plaintiff was seen again by Mr. Schneider (T154-55), and she reported that she was bothered by hyperacusis[6] (T154). Plaintiff also claimed that she had

---

5 Labyrinthitis is "[a]n inflamation . . . of the labyrinth . . . . Symptoms include vertigo . . . ." Taber's Cyclopedic Medical Dictionary (18th ed. 1997).

6 Hyperacusis is "[a]n abnormal hypersensitivity to sound, sometimes found in hysteria, in which hearing is abnormally acute." Taber's Cyclopedic Medical Dictionary (18th ed. 1997).

more significant episodes of vertigo, with one episode lasting an entire week the previous year (Id.). Mr. Schneider reported that plaintiff scored, "as positively . . . as any patient [he had] ever seen" on the Tinnitus Handicap Inventory and the Tinnitus Impact Assessment (T154). He opined that "she absolutely has intractable, disabling tinnitus and hyperacusis" (Id.).

**3. Evidence Subsequent to the Relevant Period (Subsequent to June 30, 2000)**

On October 30, 2000, plaintiff was seen by Michael J. Michotek, M.D. (T204). She complained of tinnitus and popping in her ears (Id.). Dr. Michotek prescribed Valium (Id.). Plaintiff did not seek treatment for her tinnitus again until September 23, 2002, when she was seen by Dr. Kawinski (T200). At this time, plaintiff described her tinnitus as ongoing and increasing (Id.). She also reported feeling depressed, and claimed that she could not work and had poor sleep (Id.). Dr. Kawinski reported that this gap in treatment was because plaintiff had, ". . . exhausted all treatment modalities available to her," and, "as a result, the frequency of her treatment was reduced" (T273).

On March 28, 2003, plaintiff was seen by Michael Andrew Meyer, M.D. (T233-34). He reported that plaintiff had severe post-infectious tinnitus which had caused depression since October 2002 (T233).

Plaintiff was seen again by Dr. Diaz Ordaz on June 26, 2003 (T231-32, repeated at T235-36; see T237-38). Dr. Diaz Ordaz stated that over the past year, the intensity of plaintiff's tinnitus had become so loud that it was disabling, and that plaintiff was becoming

depressed (T231, repeated at T235). Over the previous year, the intensity and frequency of plaintiff's vertigo had also reportedly increased (Id.).

On November 6, 2003, plaintiff underwent an audiological evaluation with Susan T. Roberts, Au.D., which revealed normal hearing, with tinnitus and hyperacusis (T229-30). Various treatment modalities were recommended, including tinnitus retraining therapy with noise generators and vestibular rehabilitation (T230).

In December 2003, Linda Miller, a nurse practitioner at Dr. Kawinski's office, requested approval of bilateral noise generators from plaintiff's insurer (T228) and reported that plaintiff's tinnitus was worsening (Id.).

**Hearing Testimony Conducted on September 21, 2004**

At the time of her hearing, plaintiff was 27 years old (DOB 1/4/77). She testified that she completed high school and one semester of college (T282). Plaintiff claimed that she first started experiencing dizziness in 1997, and that she currently experienced it about two or three times per week (T284-85). She alleged that it sometimes caused her to stay in bed for two to three days, which "could happen at least once a month . . ." (T285).

Plaintiff reported a high-pitched, disabling, loud ringing in both ears (T285). She claimed that everyday activities, such as eating, moving her head and walking, made it worse, and that nothing made it better (T286). On a good day, plaintiff could walk for thirty minutes before needing a five-or-ten minute break, and on a bad day, she could walk for possibly ten minutes, and would then experience a dizzy spell (T289). She claimed that she did not read because she could not concentrate, due to the tinnitus (T291-92). Plaintiff used noise

generators which made the ringing in her ears less debilitating (T286). Plaintiff was also undergoing tinnitus retraining therapy (T287).

Plaintiff testified that she was terminated from three different jobs in 1999 because she was unable to attend work regularly due to doctors' appointments and dizzy spells (T292). She claimed that she was sent home from work at least twice per week due to dizzy spells (T293). She alleged that her dizziness and tinnitus worsened since the time she worked (T293, 295).

With respect to plaintiff's daily activities from December 1999 to June 2000, plaintiff testified that she did light household chores, but was unable to engage in activities which involved loud noises, such as using the dishwasher (T290-91). Plaintiff testified that she drove when necessary (T282).

**Vocational Expert**

Casey Vass, a vocational expert, testified that plaintiff had worked as a childcare worker, requiring a light exertional capacity (T296). Mr. Vass opined that an individual who could not work in a loud environment, be exposed to heights, or other dangerous conditions could perform the exertionally light jobs of hand packer, file clerk, and mailroom clerk, there being numerous such jobs regionally and nationally (T297). Mr. Vass further testified that an individual with the same residual functional capacity as plaintiff who had difficulty with attention and concentration would be precluded from all work (T298).

Mr. Vass testified that missing more than a day and a half per month would preclude retainment at any job (T298). During the initial 90 days of employment, Mr. Vass

estimated that attendance would have to be close to perfect and that an individual could miss, “maybe a day a month the first 90 days” (T299-300).

**ALJ Burock’s Decision**

ALJ Burock found that “through the date last insured [plaintiff] had the following severe impairments: tinnitus accompanied by spells of dizziness with some vertigo” (T28-29, 34). He also found that she had “situational depression which did not constitute severe impairment” (T29, 34). ALJ Burock found that the plaintiff did not have an impairment or combination of impairments which met or medically equaled the criteria of an impairment defined in the Listing of Impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1, Regulations No.4 (T30). Specifically, ALJ Burock found that the plaintiff’s tinnitus and vertigo did not meet or medically equal the hearing loss and disturbance of labyrinthe-vestibular function covered by sections 2.07 and 2.08 of the listings (Id.).

With respect to plaintiff’s residual functional capacity to perform past work, ALJ Burock concluded that:

> “The claimant had no exertional limitations. However, she could not climb ladders, ropes, or scaffolds; work at unprotected heights or in dangerous situations; or tolerate exposure to a loud work environment. The claimant was nonexertionally limited to routine repetitive tasks; she was not capable of detailed or complex tasks, which are required in semi-skilled and skilled work activities” (T29).

Consequently, ALJ Burock determined that plaintiff did not retain the residual functional capacity to perform past relevant work as a child-care worker (T33).

However, based on the testimony of Mr. Vass that individuals with conditions similar to plaintiff would be able to perform light-level occupations such as file clerk, hand

packer, or mailroom clerk, ALJ Burock concluded that the plaintiff was capable of making a successful adjustment to another field of work, and concluded that she was not under a disability at any time through the date of last insured status (T34, 35).

**Additional Evidence Submitted to the Appeals Council**

Following ALJ Burock's decision, plaintiff submitted additional medical records to the Appeals Council (T3-4, 273, 275), including an October 9, 2005 report from Dr. Kawinski (T273). Dr. Kawinski opined that plaintiff's "vertigo, dizziness, ringing in the ears, and hypersensitivity to sounds prevented her from gainful employment from 1999 through the time she left [his] care" in 2003 (Id.). Dr. Kawinski further opined that plaintiff "has been debilitated to the point that she would not have been able to attend work had she been employed. Those exacerbations, occur with sufficient frequency that [plaintiff] could never be considered a reliable employee" (Id.).

**Appeals Council's Decision**

The Appeals Council denied plaintiff's request for review (T5). In reaching this conclusion, the Appeals Council noted that although they considered the additional evidence submitted including Dr. Kawinski's October 9, 2005 letter (T 3, 8), it did "not provide a basis for changing the [ALJ's] decision" (T6).

## DISCUSSION AND ANALYSIS

### I. Scope of Judicial Review

The Social Security Act states that, upon review of the Commissioner's decision by the district court, "[t]he findings of the Commissioner . . . as to any fact, if supported by

substantial evidence, shall be conclusive . . . ." 42 U.S.C. §405(g). Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion". Consolidated Edison Co. of New York, Inc. v. NLRB, 305 U.S. 197, 229 (1938) (citations omitted).

Under this standard, the scope of judicial review of the Commissioner's decision is limited. This Court may not try the case *de novo,* nor substitute its findings for those of the Commissioner. Townley v. Heckler, 748 F. 2d 109, 112 (2d Cir. 1984). Rather, the Commissioner's decision may be reversed only when it is based on legal error or is not supported by substantial evidence in the record as a whole. Balsamo v. Chater, 142 F. 3d 75, 79 (2d Cir. 1998). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the Court's independent analysis of the evidence may differ" from that of the Commissioner. Martin v. Shalala, 93-CV-898, 1995 WL 222059, at *5 (W.D.N.Y. March 20, 1995) (quoting Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992)).

However, before deciding whether the Commissioner's determination is supported by substantial evidence, I must first determine "whether the Commissioner applied the correct legal standard". Tejada v. Apfel, 167 F. 3d 770, 773 (2d Cir. 1999) (citations omitted). "Failure to apply the correct legal standards is grounds for reversal." Townley, supra, 748 F. 2d at 112.

## II. The Disability Standard

The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for

a continuous period of not less than twelve months." 42 U.S.C. §1382c(a)(3)(A). The impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §1382c(a)(3)(B).

The determination of disability entails a five-step sequential evaluation process:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a 'severe impairment' which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a 'severe impairment,' the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not 'listed' in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps."

Shaw v. Chater, 221 F. 3d 126, 132 (2d Cir. 2000); see also 20 C.F.R. §§404.1520, 416.920.

## III. Analysis

Plaintiff argues that the Appeals Council erred in failing to explain why it did not give controlling weight to Dr. Kawinski's October 9, 2005 report in which he opined that plaintiff could not do her usual work or any other work during the relevant period, and that she could never be considered a reliable employee (Dkt. #8, pp. 6-7, see T273).[7] In response, the Commissioner asserts that the Appeals Council properly refused to review ALJ Burock's decision because the decision was supported by substantial evidence (Dkt. #10, p. 3).

The regulations expressly authorize a claimant to submit "new and material" evidence to the Appeals council when requesting review of the ALJ's decision, without a "good cause" requirement. See 20 C.F.R. §§404.970(b), 404.976(b) 416.1470(b); see also Perez v. Chater, 77 F. 3d 41, 45 (2d Cir. 1996) (The regulations and caselaw provide that "new and material" evidence submitted to the appeals council must be considered). "When the Appeals Council denies review after considering new evidence, the secretary's final decision necessarily includes the Appeals Council's conclusion that the ALJ's findings remained correct despite the new evidence". Perez, supra, 77 F. 3d at 45. Accordingly, the additional evidence also becomes part of the administrative record on appeal when the Appeals Council denies review. See Schaal v. Apfel, 134 F. 3d 496, 505 n. 8 (2d Cir. 1998).

Here, the Appeals Council's decision reflects that it did consider Dr. Kawinski's October 9, 2005 report, but denied plaintiff's request for review finding that "it did not provide a basis for changing the [ALJ's] decision" (T5-6, 8). Consequently, "[t]he Appeals Council

---

[7] Plaintiff also relies on a September 12, 2005 letter from Philip A. Penepent, Jr., M.D. and Linda Miller, F.N.P. submitted to the Appeals Council following the ALJ's determination, indicating that plaintiff was "totally disabled from 9/23/02 to the present" (Dkt. #8, pp. 6-7, see T275). However, plaintiff's insured status expired on June 30, 2000. Thus, this opinion does not relate to the relevant period. See Kocaj v. Apfel, 97-CV-5049, 1999 WL 461776, at *6 (S.D.N.Y. July 6, 1999) (opinion that claimant was disabled following the date her insured status expired was not relevant where it did not disclose the severity of plaintiff's condition before her insured status expired).

appears to have made an implicit finding that the evidence was in fact new and material. Tai-Fatt v. Barnhart, No. 04-CV-9274, 2005 WL 3206552, at *12 (S.D.N.Y. November 30, 2005) (internal quotation marks omitted).

While it is true that the ultimate determination of disability is reserved to the Commissioner, this fact "does not exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited". Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999). The treating physician's opinion must be given controlling weight if it is "'well-supported by medically acceptable [evidence] and is not inconsistent with the other substantial evidence in [the] record.' " Id. (quoting 20 C.F.R. § 404.1527(d)(2)).

Although the treating physician's opinion need not be given controlling weight where it is "contradicted by other substantial evidence in the record", Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted), the Commissioner must recite "good reasons" for not crediting the opinion. Snell, supra, 177 F.3d at 133.[8] "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even - and perhaps especially - when those dispositions are unfavorable". Id. at 134; see also Montalvo v. Barnhart, 457 F. Supp. 2d 150, 168 (W.D.N.Y. 2006) (Elfvin, J.).

In his October 9, 2005 report, Dr. Kawinski stated that plaintiff's vertigo, dizziness, ringing in the ears, and hypersensitivity to sounds prevented her from gainful employment from 1999 through 2003 (T273). He also opined that the ringing in plaintiff's ears was constant, and prevented her from concentrating sufficiently to be gainfully employed (Id.). Dr. Kawinski's opinion concerning plaintiff's inability to work is corroborated by Mr.

---

[8] "We will always give good reasons in our notice of termination or decision for the weight we give your treating source's opinion." 20 C.F.R. §404.1527(d)(2).

Vass' opinion that an individual with plaintiff's residual functional capacity and difficulty with attention and concentration would be precluded from all work (T298). Significantly, no other physician expressed an opinion as to the impact of plaintiff's symptomology on her ability to perform work. Thus, Dr. Kawinski's testimony is uncontroverted and directly contrary to ALJ Burock's finding that plaintiff could perform other work (T35).

Under these circumstances, "[t]he Appeals Council was required either to give controlling weight to this retrospective diagnosis, or at the very least provide a 'good reason' for not granting such weight to it." Dhanraj v. Barnhardt, No. 04-CV-5537, 2006 WL 1148105, at * 9 (S.D.N.Y. May 1, 2006). Because this was not done, plaintiff's claim should be remanded to the Commissioner to properly evaluate the opinion provided by Dr. Kawinski. See Barkley v. Barnhart, 250 F. Supp. 2d 271, 281 (W.D.N.Y. 2003) (Siragusa, J.) (remanding where the Appeals Council considered additional medical opinions, but found that these additional records did not provide a basis for changing the ALJ's opinion, "without even discussing them").

Therefore, I recommend that this case should be remanded to the Commissioner to explicitly weigh and consider Dr. Kawinski's October 9, 2005 letter submitted after the ALJ's decision.

## CONCLUSION

For these reasons, I recommend that the Commissioner's motion for judgment on the pleadings (Dkt. #6) be DENIED, and that plaintiff's motion for judgment on the pleadings (Dkt. #8) be GRANTED to the extent that it seeks to vacate the Commissioner's

determination and to remand the case to the Commissioner for further proceedings consistent with this Report and Recommendation. Pursuant to 28 U.S.C. §636(b)(1), it is hereby

ORDERED, that this Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance. See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co., 840 F. 2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); Wesolek v. Canadair Ltd., 838 F. 2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report and Recommendation), may result in the District Judge's refusal to consider the objection.

**SO ORDERED.**

DATED: July 23, 2007

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge